1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WELLONS, INC., an Oregon corporation,

               Plaintiff,

     v.

SIA ENERGOREMONTS RIGA LTD., a
Latvian limited liability company,

               Defendant.

CASE NO. C13-5654 RJB

ORDER ON DEFENDANT
ENERGOREMONTS RIGA, LTD.'S
MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION,
*FORUM NON CONVENIENS*, OR
COMITY

This matter comes before the court on Defendant Energoremonts Riga, LTD.'s Motion to

Dismiss for Lack of Personal Jurisdiction, Forum Non Conveniens, or Comity.  Dkt. 10. The

court has considered the relevant documents and the remainder of the file herein.

PROCEDURAL HISTORY

On May 20, 2013, plaintiff Wellons, Inc. (Wellons), an Oregon corporation that does

business in Clark County, Washington, filed this civil case in Clark County Superior Court

against Sia Energoremonts Riga LTD, (SER) a Latvian limited liability company, asserting

1 breach of contract.  Dkt. 1.  On August 2, 2013, the case was removed to federal court on the

2 basis of diversity of citizenship.  Dkt. 1, at 2.

3                                    MOTION TO DISMISS

4          On August 9, 2013, SER filed a motion to dismiss, contending that (1) there is no basis

5 for personal jurisdiction over SER, a Latvian company; (2) the case should be dismissed on the

6 basis of *forum non conveniens* because Latvia is the proper forum for this dispute; and (3) the

7 case should be dismissed under the principles of international comity, in favor of a forum in

8 Latvia.  Dkt. 10.

9          On September 9, 2013, Wellons filed its opposition, arguing that SER's communications

10 with Washington residents, visit to Washington to negotiate the contract, and ongoing business

11 relationship with Wellons were sufficient to establish personal jurisdiction.  Wellons also

12 contends that neither forum is favorable in comparison to the other so the case should not be

13 dismissed under *forum non conveniens* or the principles of international comity.  Dkt. 13.

14          SER filed its reply on September 13, 2013.

15                                    RELEVANT FACTS

16     ***Introduction.***  Plaintiff Wellons is an Oregon Corporation with its corporate offices in

17 Vancouver, Washington.  Dkt. 14, at 1.  Dave Butler is a sales director and project manager from

18 Wellons, and he was the main point of contact for Defendant SER with Wellons.  Dkt. 14, at 1.

19 Mr. Butler works out of Wellons' Vancouver office, as well as his home office in Gig Harbor,

20 Washington.  *Id.*

21          Defendant SER is a Latvian industrial construction company specializing in the design

22 and construction of large scale heating and power plants.  Dkt. 11, at 1.  SER is located in Riga,

23

24

ORDER ON DEFENDANT ENERGOREMONTS
RIGA, LTD.'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION, FORUM NON
CONVENIENS, OR COMITY- 2

1  Latvia.  *Id*.  SER has no offices in the United States, no agents in the United States, and no

2  projects in the United States.  *Id*. at 4.

3       This dispute arose out of a heating and power plant in Riga that SER constructed for

4  Rigas Siltums, a Latvian heating utility owned in part by the Latvian Ministry of Economics and

5  the municipality of Riga. *Id.* at 2.  Wellons provided a wood-fired boiler system for the plant,

6  and, after a boiler component malfunctioned during installation, SER declined to pay Wellons

7  everything owed under the contract.  *Id*., at 9.  Consequently, Wellons brought this suit to

8  recover the full amount due on the contract.  Dkt. 1-1, at 4-5.

9       ***Contract Negotiations Begin.***  The parties began negotiating in the summer of 2009.

10  Dkt. 11, at 2.  According to Ingars Draudzins, SER's Thermopower plants and Boiler Houses

11  Department Director, Gandras Energoefektas (Gandras) introduced SER to Wellons.  *Id.*

12  Gandras is a Lithuanian company and was one of SER's suppliers for equipment.  *Id.*  Following

13  this introduction, Mr. Butler met with SER representatives in Latvia.  Dkt. 14, at 1.  This

14  meeting, which also took place in the summer of 2009, was the first meeting of the parties.  *Id.*

15       The parties continued to correspond via e-mail messages, Skype phone calls, and in-

16  person meetings.  Dkt. 14, at 1; Dkt. 11, at 3.  Although Mr. Butler was sometimes traveling

17  while communicating with SER, the communications between Latvia and Washington State were

18  frequent throughout the business relationship.  Dkt. 11, at 6; Dkt. 14-1, at 2.  In his declaration,

19  Mr. Butler stated that he has 213 email messages on his computer from SER to him, "along with a

20  few to other representatives of Wellons." Dkt. 14, at 2.  "The vast majority of these" were sent to

21  Mr. Butler while he was present in Washington State.  *Id.*  Mr. Butler also has 285 email

22  messages that he sent to SER, "including a few that were sent by other Wellons' representatives."

23  *Id.* "The vast majority of these were sent from Washington state" as well.  *Id.*

24  ORDER ON DEFENDANT ENERGOREMONTS
   RIGA, LTD.'S MOTION TO DISMISS FOR LACK
   OF PERSONAL JURISDICTION, FORUM NON
   CONVENIENS, OR COMITY- 3

1    According to SER, communications ran though Gandras until at least March of 2010.

2    Dkt. 11, at 3.  Soon after, SER began working directly with Wellons as SER prepared its bid to

3    construct the heating and power plant in Riga.  *Id.*  Ultimately, Mr. Butler emailed SER (copying

4    Gandras) an offer containing technical and pricing information in March 2010 (the Offer).  Dkt.

5    11, at 3.  SER incorporated the Offer into its final bid.  Dkt. 10, at 4.

6    SER continued to cultivate its relationship with Wellons through April of 2010, and

7    visited an operating Wellons' boiler in Russia.  Dkt. 11, at 4.  SER also requested Wellons send

8    some brochures about Wellons broilers.  Dkt. 14-1, at 4.

9    ***SER Contracts with Wellons.***  At the end of 2010, SER learned from Rigas Siltums that

10   it had been awarded the project.  Dkt. 11, at 4.  On January 6, 2011, SER sent an email to

11   Wellons asking Wellons to send a "standard contract draft," in the hope that it would be a "good

12   start of long term cooperation for future!!!" Dkt. 14-1, at 6.  Mr. Butler suggested that the parties

13   "sit down and work through the various specifics of the project.  *Id.*, at 7.  SER agreed, e-mailing

14   that "we must discuss all the items asap." *Id.* at 6.

15   SER and Wellons then arranged for SER to travel from Latvia to Wellons' corporate

16   offices in Vancouver to discuss the contract.  *Id.* at 7.  Mr. Butler recommended by e-mail

17   message that SER fly into Portland, Oregon, as the Portland airport was only 15 minutes from

18   Wellons' offices in Vancouver.  *Id.*  The parties then contemplated spending one day touring a

19   plant south of Portland, which had a Wellons boiler; and two days discussing the contract

20   proposal at Wellons' offices in Vancouver.  *Id.*, at 6; Dkt. 11, at 3.

21   Wellons also provided SER with an "expected" schedule for the project.  Dkt. 14-1, at 7.

22   This schedule estimated that the boiler would be in operation 64 weeks after the contract was

23   signed.  *Id.*  Wellons' work in its facilities stateside (engineering, designing, manufacturing,

24

ORDER ON DEFENDANT ENERGOREMONTS
RIGA, LTD.'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION, FORUM NON
CONVENIENS, OR COMITY- 4

1  procuring, and shipping the boiler components) was estimated to take 52 weeks.  *Id.*  Installation

2  was estimated to start 36 weeks into the project, and the system would be in operation 28 weeks

3  later.  *Id.*

4       One week later three SER employees (Pavels Arsenjans, Janis Vilmanis, and Ingars

5  Draudzins) flew from Riga to Portland and followed the contemplated itinerary.  Dkt. 11, at 4.

6  Mr. Draudzins indicated that SER toured the plant south of Portland, and then spent two days

7  discussing the contract proposal at Wellons' offices in Vancouver, WA.  *Id.*  The SER employees

8  stayed at a hotel in Portland.  *Id.*

9

10       Negotiations continued after the SER representatives returned to Riga, and the contract

11  was finalized by early February.  Dkt. 11, at 4-5.  SER signed on February 10th, 2011, and

12  Wellons signed on February 11th.  *Id.,* at 5; Dkt. 11-1, at 58.

13       ***Contract Details.***  The contract's cover page reflects that it was prepared by Wellons for

14  SER.  *Id.* at 13.  Wellons' address is listed on the front page as "2525 West Firestone Lane,

15  Vancouver, Washington 98660."  *Id.*  The cover page separately provides that Wellons'

16  headquarters is in Vancouver.  *Id.*  Overall, the contract details a general list of services that

17  Wellons will provide via its own facilities: "The proposed scope covers engineering and design of

18  the boiler, furnace and associate air and gas handling systems, manufacturing of the steam

19  generator and combustion equipment, and procurement of the plant equipment enumerated in

20  this proposal.  The scope also includes technical assistance with mechanical installation and

21  commissioning on a per diem basis." *Id.*, at 15.  The contract further provides that all shipments

22  would depart from either Vancouver, Washington, or Sherwood, Oregon: "Wellons will prepare

23  all equipment for overseas shipment and will load the equipment into standard or hi-cube

24

ORDER ON DEFENDANT ENERGOREMONTS
RIGA, LTD.'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION, FORUM NON
CONVENIENS, OR COMITY- 5

1   containers, provided by the Purchaser to Wellons facilities in Vancouver, WA or Sherwood, OR,

2   USA." *Id.* at 46.  Price calculations similarly anticipated that the equipment would ship from

3   Vancouver: "Prices shown [in the contract] are Ex-Works, Vancouver, Washington, USA, loaded

4   into Purchaser's containers for overseas shipment." *Id.* at 48.  SER agreed to pay Wellons a total

5   price in U.S. Dollars of $5,250,000.  *Id.* at 47.  The preliminary delivery schedule estimated that

6   final delivery would take Wellons 50 weeks from the date of initial deposit.  *Id.* at 48.  The

7   contract makes no mention of applicable law or choice of forum.

8       During the course of the contract, SER made payments by depositing money into

9   Wellons' accounts in either Portland, Oregon, or Minneapolis, Minnesota.  Dkt. 11, at 5.  SER's

10   bank for the project was SEB banka in Latvia. Dkt. 11, at 5.

11       ***Execution of the Contract.***  Work on the project began soon after the contract's

12   finalization. "Wellons made the boiler components, then, the components were shipped to Latvia

13   by the Arco Transport company, an Estonian company with offices in Estonia and Latvia." Dkt.

14   11, at 5.  Meanwhile, SER constructed the rest of the heating and power plant in Riga.  *Id.*, at 5-6.

15   The final shipment left Wellons facilities by January 6, 2012.  Dkt. 14-1, at 14.  A total of 41

16   containers were sent from Wellons' facilities to Riga.  *Id.*

17       The contract also obligated Wellons to provide "technical assistance with mechanical

18   installation and commissioning on a per diem basis." Dkt 11-1, at 15.  Wellons employees

19   traveled to Riga multiple times to assist with commissioning the plant.  Dkt. 11, at 6.

20       ***Boiler Malfunctions.***  On January 28, 2013, Mr. Draudzins e-mailed Mr. Butler and

21   informed him that a safety valve for the boiler had a problem.  Dkt. 11, at 6.  Mr. Draudzins

22   explained that SER had decided to stop work to dismantle and inspect the safety valve.  *Id.* at 7.

23

24

ORDER ON DEFENDANT ENERGOREMONTS
RIGA, LTD.'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION, FORUM NON
CONVENIENS, OR COMITY- 6

Wellons sent an employee, Pete Harwood, to Riga to assist with the issues.  *Id.*  Wellons ended up ordering a new safety valve from its supplier, Farris Engineering.  *Id.*  Wellons' engineers also sent ideas on how to fix the valve situation to Mr. Harwood and others working on the problem in Riga.  *Id.*

The second valve did not work either.  *Id.*  SER emailed Mr. Butler to notify him and urgently requested that he send a technical expert from Farris to check the valve in the field and determine the cause of the problem.  *Id.*  SER believed the Farris factory to be located in Ohio, but soon Farris' parent company in the United Kingdom became involved.  *Id.* at 7-8.  On February 20, 2013, Mr. Butler notified SER that the valves would have to go to a factory for testing because Farris did not offer field service.  *Id.* at 8.

On February 23, 2013, Mr. Draudzins e-mailed Mr. Butler, stating that SER had been able to get the boiler working at an 80% load through a repair of the first valve, but the boiler still could not be run up to 100% because of the risk that the safety valve could once again fail.  Dkt. 11, at 8.  Mr. Draudzins stated in the e-mail that, because Wellons and Farris had offered no solutions other than to send the valve to the factory, SER was forced to order a new valve from another manufacturer. Dkt. 11, at 8.

The new valve SER purchased and installed was supplied by Gandras and manufactured by a Russian company, TKZ Krasnij kotelshik. Dkt. 11, at 9.

The official opening of the plant was February 28, 2013, and was attended by government representatives, media, and others.  Dkt. 11, at 9.  SER had the plant running by then, on a reduced load, at approximately half power.  Dkt. 11, at 9.  SER maintains that the boiler continues to operate at well below capacity and specification.  Dkt. 11, at 10.

1   Wellons sent SER invoices for the remainder due under the contract.  Dkt. 11, at 9.  SER

2 protested, and alerted Wellons to additional problems discovered by Rigas Siltums shortly after

3 the plant's opening.  Dkt. 11, at 9.  Wellons continued to demand payment.  Dkt. 11, at 9.  This

4 lawsuit ensued.

5   ***Other Orders***.  During the course of the contract, the two parties discussed other orders

6 and projects.  First, in August of 2012, SER requested that Wellons order a pipe for a shoot

7 blower.  Dkt. 14-1, at 16.  Later that same month, Wellons sent SER a proposal for another

8 project called the NZ Sabiedviba project.  *Id.* at 18.  Additionally, SER ordered a pressure switch

9 from Wellons in early 2013.

10         <u>LATVIAN JUDICIAL SYSTEM</u>

11   According to Līga Fjodorova, an attorney at law authorized to practice law in Latvia,

12 Latvian courts have jurisdiction over all civil legal disputes unless otherwise provided for by

13 law, under Section 23 of the Latvian Civil Procedure Law (CPL).  Dkt. 12, at 2-3.  It is a general

14 principle under Latvian Civil Procedure Law Section 26, that the jurisdiction is the place of

15 defendant's domicile.  Dkt. 12, at 3.  In this case, if suing in Latvia, plaintiff would presumably

16 bring the case in the regional court because the dispute exceeds 150,000 Lats (Ls)

17 (approximately $285,000). Dkt. 12, at 4.

18   Trial in that court would be before a judge, and a party could appeal a judgment in that

19 court to the Latvian Supreme Court.  Dkt. 12, at 4.  A defendant could also assert a counterclaim

20 in the proceeding.  Dkt. 12, at 3.  Latvian Civil Procedure Law provides procedures for the

21 summoning of witnesses (and subjecting them to fines for failure to appear) and for the securing

22 of evidence.  Dkt. 12, at 5-6.  Witnesses can appear by video in the appropriate circumstances.

23 Dkt. 12, at 5-6.

24

DISCUSSION

**1.   PERSONAL JURISDICTION**

*Motion.*  SER moves to dismiss the case for lack of personal jurisdiction, arguing that SER performed no work in Washington and has no presence in Washington; there is no connection between SER and the State of Washington to establish personal jurisdiction over SER; and the one visit SER employees made to Washington is not sufficient to establish the minimum contacts required to subject SER to jurisdiction in Washington.  (Dkt. 10)

*Legal Standard.*  Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate. *Schwarzenegger v. Fred Martin Motor Company*, 374 F.3d 797, 800 (9th Cir. 2004).  The plaintiff need only make a prima facie showing of the jurisdictional facts to withstand the motion where, as here, the district court rules without holding an evidentiary hearing.  *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).  In order to make a prima facie showing, plaintiff must allege facts that, if true, would be sufficient to establish personal jurisdiction.  *Id.*  If not directly controverted, plaintiff's version of the facts is taken as true for the purposes of the motion.  *Id.* Conflicts between the facts stated in the parties' affidavits must be resolved in plaintiff's favor. *Dole Food Co., Inc. v. Watts,* 303 F.3d 1104, 1108 (9th Cir.2002).

When jurisdiction is not controlled by a federal question, the district court applies the law of the state in which the district court sits to determine whether the plaintiff has met its burden. *Schwarzenegger,* 374 F.3d at 800.  However, Washington's long-arm jurisdictional statute is co-extensive with federal due process requirements, so the jurisdictional analysis under state law and federal due process is the same.  *Cognigen Networks, Inc. v. Cognigen Corp.*, 174 F.Supp.2d 1134, 1137 (W.D. Wash. 2001).  Federal due process requires the defendant to have minimum

1  contacts with the relevant forum.  *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).  A

2  district court can only exercise personal jurisdiction over a non-resident defendant (absent the

3  defendant's consent) if the court has (1.1) general jurisdiction or (1.2) specific jurisdiction.

4  *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).

### 1.1.    General Jurisdiction.

6        For general jurisdiction to exist over a nonresident defendant, that defendant must engage

7  in continuous and systematic general business contacts that approximate physical presence in the

8  forum state.  *Schwarzenegger,* 37 F.3d at 801.  Factors worthy of consideration include whether

9  defendant makes sales, solicits or engages in business in the state, serves the state's markets,

10  designates an agent for service of process, holds a license, or is incorporated there.  *Bancroft &*

11  *Masters, Inc.,* 223 F.3d at 1086.  The threshold for satisfying the requirements for general

12  jurisdiction is substantially greater than that for specific jurisdiction.

13        It is undisputed that at the time the present lawsuit was filed, SER did not have offices,

14  agents, or projects in the United States.  Wellons presents no argument that the threshold for

15  general jurisdiction has been met, relying entirely on specific jurisdiction in its opposition.  This

16  Court lacks grounds to exercise general jurisdiction over SER.

### 1.2.    Specific Jurisdiction.

18        The Ninth Circuit has established a three-pronged test for analyzing a claim of specific

19  jurisdiction: (1) the non-resident must purposefully direct his activities or consummate some

20  transaction with the forum or resident thereof; or perform some act by which he purposefully

21  avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits

22  and protections of its laws; (2) the claim must be one which arises out of or relates to the

23

24

1  defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair

2  play and substantial justice, i.e. it must be reasonable. *Doe v. Unocal Corp.*, 248 F.3d at 923.

3      *Purposeful Availment.* Plaintiff Wellons brings a contract claim in the case at hand, and

4  the relevant inquiry is whether the defendant purposefully availed itself of the privilege of

5  conducting activities in the forum state. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et*

6  *L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006).

7      This first prong is satisfied when the defendant has performed some type of affirmative

8  conduct that allows or promotes the transaction of business within the forum state. *Doe v.*

9  *Unocal Corp.*, 248 F.3d at 924. Contracting with an out-of-state defendant does not

10 automatically establish sufficient contacts to support personal jurisdiction. *Doe v. Unocal Corp.*,

11 248 F.3d at 924. The court must examine the circumstances of the entire transaction, including

12 prior negotiations, contemplated future consequences, contract terms, and the parties' actual

13 course of dealing. *CTVC of Hawaii, Co., Ltd. V. Shinawatra*, 82 Wn. App. 699, 711, 919 P.2d

14 1243 (1996). The "salient factor" in determining purposeful availment is whether the defendant

15 negotiated an ongoing business relationship with a Washington company that has substantive

16 effects and created future obligations in Washington. *SeaHAVN, Ltd. v. Glitnir Bank,* 154 Wn.

17 App. 550, 568, 226 P.3d 141 (2010) (citing *Precision Laboratory Plastics, Inc. v. Micro Test,*

18 *Inc.*, 96 Wn. App. 721, 727 n.5, 981 P.2d 454 (1999)).

19     Here, SER deliberately conducted activities in Washington, the forum state. SER's prior

20 negotiations with Wellons, a company headquartered in Washington, and Mr. Butler, who works

21 and lives in Washington, were extensive. In all, the parties sent almost 500 email messages

22 throughout their business relationship, a "vast majority" of which were to or from Washington

23 State. Dkt. 14, at 2. SER employees traveled from Riga, Latvia, to Wellons' corporate offices in

24

ORDER ON DEFENDANT ENERGOREMONTS
RIGA, LTD.'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION, FORUM NON
CONVENIENS, OR COMITY- 11

Vancouver, Washington, and spent two days negotiating the contract's details.  The fact that the contract was not signed while both parties were in Washington is not dispositive in light of SER's other contacts with the forum state.  *See Sorb Oil Corp. v. Batalla Corp.,* 32 Wn. App. 296, 299, 647 P.2d 514 (1982) (providing that personal jurisdiction "may be exercised if it is contemplated that some part of the transaction will take place in the forum state, although the transaction is to be consummated elsewhere").

Moreover, the contract's terms and the parties' communications reflect future consequences in the forum state.  First, SER had the obligation to pay a Washington resident, Wellons, more than $5 million.  The importance of this obligation cannot be overlooked, as Wellons relies on this obligation in the present dispute.  Second, the contract expressly provided that Wellons "prepare all equipment for overseas shipment" and load the equipment into shipping containers that would depart from Wellons' facilities in either "Vancouver, WA, or Sherwood, OR, USA." In light of this, SER cannot credibly argue that it did not contemplate future consequences in Washington State.  The contract clearly contemplated shipping the boiler components, including the malfunctioning safety valve, out of Washington.

SER also cannot seriously dispute the extent of these future consequences in the forum state.  Wellons initially envisioned 52 weeks (one full year) of engineering, designing, manufacturing, procuring and/or shipping the boiler's components, all of which took place at its facilities.  Construction in Riga, on the other hand, was only estimated to take 28 weeks, nearly half the length of Wellons' commitments.  In the end, Wellons' estimates were not far off:  the final shipment departed Wellons facilities 47 weeks (roughly 11 months) after the contract was signed.  SER cannot credibly argue that it did not anticipate being haled into court in a forum in which such extensive future consequences were contemplated.

1    Finally, SER and Wellons had an ongoing business relationship that created future

2  obligations in Washington State.  The two parties were introduced in the summer of 2009 and

3  were still working together in the summer preceding this lawsuit, four years later.  SER's own e-

4  mail messages from 2011 reflect its intent to create a "long term" relationship: "I hope that this will

5  be the best project for both companies and good start of long term cooperation for future!!!" Dkt.

6  14-1, at 6.  SER substantiated these words by not only finalizing the contract with Wellons, but

7  also discussing two additional orders and one proposal on another project.  Placing additional

8  orders creates future obligations in Washington State.

9    SER argues that *Harbor Cold Storage, LLC v. Strawberry Hill, LLC,* 2009 WL 3765361

10  (W.D. Wash. Nov. 9, 2009) is on point.  But *Harbor Cold Storage* is distinguishable from the

11  case at hand:  there were not extensive communications between the *Harbor Cold Storage*

12  defendant and the forum state, electronic or otherwise; the *Harbor Cold Storage* defendant's

13  discussions while present in the forum state regarded purchasing the land subject to the lease in

14  dispute, not the lease itself; the discussions in the forum state lasted only an hour, did not involve

15  the plaintiff, and occurred while the *Harbor Cold Storage* defendant was in the forum state for

16  personal reasons; the disputed lease contemplated no future consequences in Washington; the

17  court found no ongoing business relationship; and the contract's terms called for Alaska law to

18  govern the dispute.  *Id.* at *1-*5.

19    SER relies on *Harbor Cold Storage* to emphasize that personal jurisdiction was denied

20  where negotiations occurred almost exclusively outside of Washington.  Dkt. 10, at 12.  SER

21  continues by arguing that "the contemplated future consequences of the contract are to occur

22  entirely in Latvia." *Id.* (emphasis added).  While Wellons may have had extensive contacts with

23  Latvia, the court's focus in determining personal jurisdiction is on the *defendant's* contacts with

24

ORDER ON DEFENDANT ENERGOREMONTS
RIGA, LTD.'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION, FORUM NON
CONVENIENS, OR COMITY- 13

1    the forum state, and not the plaintiff's contacts with some other forum.  *See CTVC of Hawaii, Co.,*

2    *Ltd.*, 82 Wn. App. at 712.  It should come as no surprise to SER that its contacts were sufficient

3    to establish personal jurisdiction given *Clairmont v. Genuity, Inc.*, a Western District of

4    Washington case cited in SER's motion.  2004 WL 2287783 (W.D. Wash. Apr. 26, 2004)

5    (defendants were found to have continuing obligations to a forum resident in the form of owed

6    compensation, which, along with multiple phone calls and e-mail messages, was sufficient to

7    satisfy the purposeful availment prong).

8        The record shows that SER's contacts with Washington satisfy the purposeful availment

9    prong.  There are at least six reasons this prong has been satisfied: 1) SER's extensive electronic

10   negotiations with the forum state and its residents; 2) SER's deliberate trip to the forum state from

11   Latvia to negotiate the disputed contract; 3) SER's obligation to pay a business headquartered in

12   Washington over $5,000,000; 4) the contract's shipping terms; 5) the extent of future

13   consequences at Wellons' facilities; and 6) the ongoing business relationship between SER and

14   Wellons.

15       *Arises Out of or Relates To.*  Washington courts apply the "but for" test in analyzing the

16   second prong of personal specific jurisdiction.  *CTVC of Hawaii, Co., Ltd.*, 82 Wn. App. at 719.

17   Jurisdiction is proper if the events giving rise to the claim would not have occurred "but for" the

18   defendant's transaction of business in the forum.  *Id.*  The "but for" test preserves the requirement

19   that there be some nexus between the plaintiff's cause of action and the defendant's activities in

20   the state. *Raymond v. Robinson*, 104 Wn. App. 627, 640, 15 P.3d 697 (2001).  It is the plaintiff's

21   burden to establish this element.  *Id.*

22       SER argues that Wellons' claim arose from the commissioning process in Latvia and not

23   from SER's contacts with Washington.  Dkt 10, at 13.  However, the inquiry is not whether the

24

ORDER ON DEFENDANT ENERGOREMONTS
RIGA, LTD.'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION, FORUM NON
CONVENIENS, OR COMITY- 14

injury took place outside of Washington, but rather whether the cause of action arose out of SER's transaction of business in the forum.  *See Callahan v. Keystone Fireworks Mfg. Co.,* 72 Wn.2d 823, 841, 435 P.2d 626 (1967).

Wellons pleads a breach of contract claim.  The purposeful availment analysis above, regarding SER's contacts with Washington, directly addresses SER's contacts in relation to the disputed contract.  Wellons' claim would not have arisen "but for" the contract that was largely negotiated in the forum state, and contemplated future consequences in Washington State.  Even the part that allegedly malfunctioned in Latvia would not have malfunctioned but for the parties' decision to contract for the construction of a boiler in Latvia.  The record establishes that the second prong of personal specific jurisdiction analysis is satisfied.

*Reasonableness.*  The third and final prong requires the court to determine whether the exercise of personal jurisdiction is reasonable and, thus, comports with traditional notions of fair play and substantial justice.  *Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1487 (9th Cir. 1993).  The bare existence of minimum contacts is not alone sufficient.  *Doe v. Unocal Corp.*, 248 F.3d at 925.  If a defendant presents a compelling case that jurisdiction is unreasonable, the district court may not exercise personal jurisdiction over the defendant and dismissal is required.  *Id*.

In considering whether the exercise of jurisdiction over a nonresident defendant is reasonable, courts in the Ninth Circuit consider seven factors: (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective

1   relief; and (7) the existence of an alternate forum.  *Core-Vent v. Nobel Industries AB*, 11 F.3d at

2   1487-88; see also *Vernon Johnson Family Ltd. P'ship v. Bank One Texas*, 80 F.Supp. 2d 1127,

3   1133-34 (W.D. Wash. 2000) (applying factors). "These factors are not mandatory tests, each of

4   which plaintiff must pass in order for a court properly to assume jurisdiction. Instead, the factors

5   illuminate the considerations of fairness and due process." *Gates v. Learjet Corp. v. Jensen,*743

6   F.2d 1325, 1332 (9th Cir. 1984) (citing *Hedrick v. Daiko Shoji Co., Ltd., Osaka,* 715 F.2d 1355,

7   1359 (9th Cir.1983).

8          SER argues that it faces a heavy burden if subjected to a foreign legal system, and the

9   plant itself is located in Latvia, owned by the municipality of Riga, and is of special importance

10   to the Latvian people; the malfunction that led to the present dispute occurred in Latvia, and thus

11   important physical evidence is located in Latvia and not Washington; Wellons was reaching out

12   in SER's region for business, and not vice versa; and the existence of an alternative forum in

13   Latvia.  Dkt. 10, at 14-16.

14          Nonetheless, in light of these factors, the exercise of personal jurisdiction here would not

15   be unreasonable.  First, SER's contacts with Washington as discussed in the court's purposeful

16   availment analysis above are sufficient to demonstrate a purposeful interjection into the forum

17   state.  Among other acts, SER entered into an ongoing business relationship with Wellons.  The

18   contract's terms and opening page provided SER with notice that it might be brought into a

19   Washington courtroom.

20          Also, the burden of litigating in Latvia would be equally burdensome on Wellons.

21   Wellons employees may have visited Latvia during the scope of the business relationship, but

22   SER employees visited Washington and negotiated the contract.   SER has further demonstrated

23   the ability to conduct business in English, even contracting with Wellons in English.  The same

24

ORDER ON DEFENDANT ENERGOREMONTS
RIGA, LTD.'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION, FORUM NON
CONVENIENS, OR COMITY- 16

1  cannot be said for Wellons' capacity to contract and conduct business (and litigate) in Latvian.

2  Lastly, all of Wellons' witnesses are located in Washington State (Dkt. 13, at 7), as are the

3  underlying contract-related documents and Wellons' facilities, which played a major role in the

4  contract's execution.  Dkt. 13, at 7.

5         SER's additional arguments regarding sovereignty, Wellons' efforts to expand its business

6  into the region, and the existence of an alternative forum are insufficient to persuade the court.

7  First, the sovereignty factor "is not dispositive because, if given controlling weight, it would

8  always prevent suit against a foreign national in a United States court." *Gates Lear Jet Corp.,* 743

9  F.2d at 1333.  Moreover, Washington State has a legitimate interest in providing a forum for a

10  company based in Washington State and protecting the legal rights of Washington residents.

11  *Sorb Oil Corp.,* 32 Wn. App. at 301.  A nonresident defendant need not initiate the contact with

12  Washington, so long as a "business relationship" subsequently arose.  *Id.* (citing *MBM Fisheries,*

13  *Inc. v. Bollinger Mach. Shop & Shipyard, Inc.,* 60 Wn. App. 414, 423, 804 P.2d 627 (1991));

14  *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478-79 (1985).  SER cannot expect that all

15  disputes resulting from its deliberate decision to contract internationally will be handled in

16  Latvia.

17         Accordingly, the third prong of personal specific jurisdiction is satisfied.

18  **1.3     Personal Jurisdiction Conclusion**

19         Personal jurisdiction over SER is proper.  SER purposefully availed itself of Washington's

20  laws by deliberately conducting business with Washington residents and in Washington State.

21  SER's cause of action would not have arisen but for the contract that was negotiated and executed

22  largely in the forum state.  Finally, exercising personal jurisdiction over SER comports with

23

24  ORDER ON DEFENDANT ENERGOREMONTS
RIGA, LTD.'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION, FORUM NON
CONVENIENS, OR COMITY- 17

1   traditional notions of fair play and substantial justice in light of the seven reasonableness factors,

2   even assuming the convenience and adequacy of a Latvian forum.

3   ## 2.   FORUM NON CONVENIENS

4       SER also argues that the principles of *forum non conveniens* support dismissal of this

5   case in favor of Latvia given the adequate forum available in Latvia, the location of physical

6   evidence in Latvia, the convenience to non-party witnesses, and Riga's special public interest in

7   the project.  Dkt. 10, at 16-20.

8       ***Legal Standard.***  To dismiss on *forum non conveniens* grounds, the moving party must

9   show (1) the existence of an adequate alternative forum and (2) that private and public interest

10   factors balance in favor of dismissal. *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d

11   764, 767 (9th Cir.1991), (citing *Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446,

12   1449 (9th Cir.1990)).  The private and public interest factors must "strongly favor" trial in a

13   foreign country for the plaintiff's choice of forum to be disturbed.  *Lueck v. Sundstrand Corp.*,

14   236 F.3d at 1145 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947)). "A showing of

15   convenience by a party who has sued in his home forum will usually outweigh the inconvenience

16   the defendant may have shown." *Id.* (citing *Contact Lumber*, 918 F.2d at 1449 (internal quotation

17   marks omitted)).  Where the plaintiff is a United States citizen, the defendant must satisfy a

18   heavy burden of proof." *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1143 (9th cir. 2001) (citing

19   *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 25 (1981)).

20   ### 2.1.   Adequate Alternative Forum.

21       The defendant bears the burden of proving the existence of an adequate alternative forum.

22   *Lueck v. Sundstrand Corp.*, 236 F.3d at 1143.  A foreign forum will be deemed adequate unless it

23   offers no practical remedy for the plaintiff's complained of wrong.  *Id.* at 1144.  Given the above

24

1  discussion of the Latvian Judicial System, it appears SER has carried this burden.  Wellons

2  presents no counterargument on this point.

3    **2.2    Private Interest Factors**

4      The court evaluates seven private factors:  (1) the residence of the parties and the

5  witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other

6  sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of

7  bringing witnesses to trial; (6) the enforceability of the judgment; and (7) 'all other practical

8  problems that make trial of a case easy, expeditious and inexpensive.'' *Lueck v. Sundstrand*

9  *Corp.*, 236 F.3d at 1145 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

10      As Wellons contends, these factors do not *strongly* favor a trial in Latvia.  Of special

11  materiality and importance to the present dispute is the malfunctioning safety valve.  While the

12  valve allegedly malfunctioned during the commissioning process in Latvia, evidence indicates

13  that the valve was manufactured in a Farris factory in Ohio.  Out of convenience, this favors a

14  forum in Washington State more so than in Latvia.  Furthermore, the valve, along with all other

15  boiler components, were procured and shipped from Wellons' facilities.  Such facilities are also

16  of special importance to the case at hand, and favor a forum in Washington State.

17      Moreover, one party will have to travel to the opposing party's forum regardless of where

18  a trial may be held.  In this case, both Wellons and SER demonstrated the capacity to travel to

19  the opposing party's forum.  As for witness residences, SER's contention is partly true:  key non-

20  party witnesses are located outside of Washington.  However, the key non-party witnesses that

21  were involved in the formation and execution of the contract also are not from Latvia.  Gandras,

22  the third-party supplier that introduced SER to Wellons, is a Lithuanian company.  Arco

23  Transport company, the company that shipped components from Wellons to SER, is an Estonian

24

ORDER ON DEFENDANT ENERGOREMONTS
RIGA, LTD.'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION, FORUM NON
CONVENIENS, OR COMITY- 19

1   company.  And finally, the safety valve manufacturer appears to maintain a factory in Ohio, and

2   its parent company is in the United Kingdom.  Dkt. 11, at 7-8.  The parties and witnesses will

3   bear the cost of travelling internationally no matter whether the forum is in Washington State or

4   in Latvia.

5       **2.3     Public Interest Factors**

6       The court also considers a list of five public factors:  (1) local interest of lawsuit; (2)

7   court's familiarity with governing law; (3) burden on local courts and juries; (4) congestion in the

8   court; (5) the costs of resolving a dispute unrelated to the forum.  *Lueck v. Sundstrand Corp.*, 236

9   F.3d at 1147 (citing *Piper Aircraft*, 454 U.S. at 259-61).  As set forth above, the public interest

10  factors must strongly favor trial in a foreign country.  *Id.* at 1145.

11      While this court recognizes Latvia's significant local interest in resolving this dispute, the

12  State of Washington also has a significant local interest in protecting its businesses and providing

13  them with a forum to assert their legal rights.  Even if this factor weighs slightly in favor of

14  Latvia, the rest of the factors remain even.

15      Presumably, this court is just as familiar with Washington contract law as the Latvian

16  forum is familiar with Latvian contract law.  SER argues that Latvian Civil Law "could" apply in

17  addition to the UN Convention on Contracts for the International Sale of Goods, but the choice

18  of law analysis is only determinative when the case involves a United States statute requiring

19  venue in the United States.  Dkt. 12, at 6; *Lueck*, 236 F.3d at 1148.  Such is not the case here.

20      Furthermore, neither the burden on this court nor the congestion in the court favors

21  dismissal in this case more than any other case.  The final factor also does not favor dismissal

22  because this court has already found the dispute to be related to this forum.

23

24
ORDER ON DEFENDANT ENERGOREMONTS
RIGA, LTD.'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION, FORUM NON
CONVENIENS, OR COMITY- 20

1    **2.4    *Forum Non Conveniens* Conclusion.**

2        A district court has discretion to decline to exercise jurisdiction in a case where litigation

3    in a foreign forum would be more convenient for the parties.  *Lueck*, 236 F.3d at 1142.  Given

4    the globally diverse location of the parties, witnesses, and evidence, the court finds that the

5    public and private interest factors to not weigh strongly in favor of a Latvian forum.

6    Accordingly, jurisdiction should remain in this court.

7                        **3.     INTERNATIONAL COMITY**

8        SER contends that this Court should decline jurisdiction based on International Comity

9    because of the plant's location in Latvia and the project's ties to the Latvian government and

10   people. "In deference to the strong Latvian interests at issue, the Court should abstain from

11   exercising its jurisdiction in the interests of comity." Dkt. 10, at 22.

12       Under the comity doctrine courts sometimes defer to the laws or interests of a foreign

13   country and decline to exercise jurisdiction that is otherwise properly asserted.  *Sarei v. Rio*

14   *Tinto, PLC*, 487 F.3d 1193, 1211 (9th Cir. 2007).  Invoking the doctrine is within the court's

15   discretion, but the doctrine is limited to cases in which there is in fact a true conflict between

16   domestic and foreign law.  *Id.*  If a conflict of laws exists, courts then look at the nonexhaustive

17   standards set forth in Foreign Relations Law Restatement Section 403(2):

18           (a) the link between the activity and the territory of the regulating state; (b) the
             connections between the regulating state and the person principally responsible
19           for the activity; (c) the character of the activity to be regulated and the importance
             of regulation to the regulating state; (d) the existence of justified expectations that
20           might be protected or hurt by the regulation; (e) the importance of the regulation
             to the international political, legal, or economic system; (f) the extent to which the
21           regulation is consistent with the traditions of the international system; (g) the
             extent to which another state may have an interest in regulating the activity; and
22           (h) the likelihood of conflict with regulation by another state.

23   *Id.* at 1212.

24

1    No conflict of law exists where a party subject to regulation by two states can comply

2    with the laws of both. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 799 (1993);

3    Restatement (Third) Foreign Relations Law § 403 cmt. e (1987). The United States Supreme

4    Court in *Hartford* found no conflict of law because the defendant did not argue that the foreign

5    law required it to act in some fashion prohibited by the law of the United States, or that

6    compliance with the laws of both countries is otherwise impossible. *Id*. at 799.

7    Here, SER has demonstrated no conflict of laws. The fact that two nations may exercise

8    jurisdiction over a party is not conclusive in determining whether a conflict of laws exists. SER

9    has not sufficiently demonstrated a difference between Latvian contract law and Washington

10   contract law. Nor has SER demonstrated that Latvian law requires SER to act in some fashion

11   prohibited by the law of the United States, or that compliance with the laws of both countries is

12   otherwise impossible. SER has not met the international comity threshold of demonstrating a

13   conflict of laws.

14   Even assuming a conflict exists, SER has not persuaded the court to decline jurisdiction

15   under the nonexhaustive Restatement factors. Evidence demonstrates a strong connection

16   between Washington State and both the contract and SER. SER had extensive electronic

17   negotiations with Washington and its residents. SER employees traveled to Washington from

18   Latvia to negotiate the disputed contract. Furthermore, the character of this dispute supports the

19   court's decision to retain jurisdiction. SER contracted to pay a business headquartered in

20   Washington over $5,000,000. The contract included shipping terms that involved Washington.

21   Latvia's interests and SER's expectations are insufficient to persuade the court. This is a

22   contract between two private companies, and SER cannot expect that all disputes resulting from

23   its deliberate decision to contract internationally will be handled in Latvia.

24   ORDER ON DEFENDANT ENERGOREMONTS
     RIGA, LTD.'S MOTION TO DISMISS FOR LACK
     OF PERSONAL JURISDICTION, FORUM NON
     CONVENIENS, OR COMITY- 22

1    Finally, the extent to which another state may have an interest in regulating the activity,

2    as well as the likelihood of conflict with another state's regulation, do not support this court

3    declining jurisdiction any more than they support retaining jurisdiction.

4    SER has made an insufficient showing that this action should be dismissed on the bases

5    of international comity.

6                                    CONCLUSION

7    For the reasons set forth above, the Defendant's Motion to Dismiss for Lack of Personal

8    Jurisdiction, *Forum Non Conveniens,* or Comity (Dkt. 10) is **DENIED.**

9    IT IS SO ORDERED.

10   Dated this 20th day of September, 2013.

11

12

13   ROBERT J. BRYAN
     United States District Judge

14

15

16

17

18

19

20

21

22

23

24

ORDER ON DEFENDANT ENERGOREMONTS
RIGA, LTD.'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION, FORUM NON
CONVENIENS, OR COMITY- 23